Good morning, Your Honors, and may it please the Court. In a minute, I'd like to address how the substantial risk of harm from the Zappos data breach and the efforts plaintiffs made to mitigate those risks established Article III standing. But I want to start, as numerous other courts have found, but I would like to start by addressing how this case is different, namely that while plaintiffs claimed that they were injured by Zappos's negligence, they also have a run-of-the-mill consumer protection claim. They paid Zappos for services, expecting not just to get the delivery of some shoes, but they also expected competent security that Zappos would protect their personal identification information. And that's because Zappos made that explicit promise to the plaintiffs. So to that end, the complaint plausibly alleges that an appreciable part of the value of Zappos's online shoe service is that consumers' personal identification information, or PII, which they have to provide to Zappos in order to complete the transaction, Zappos promises that that information will be protected. And absent that promise, Zappos's services are worth less. And that's simply because not only does Zappos pay money for or ostensibly pay money, but also because consumers value that additional security effort. And you don't think that's an implicit guarantee in any electronic transaction with a vendor? It seems like it would be a little odd, wouldn't it, for us to say the reason that they could expect security is because they had something saying it was secure? Your Honor, it may be an implicit agreement, but for purposes of standing, the fact that it's an explicit promise puts it right into the wheelhouse of a standard consumer protection. I'm just not sure that that makes sense, though, because I would have thought that any online transaction, you have the right to expect that they're not going to distribute your information. So the fact that they said they weren't, I don't know if it really changes your injury in the way. It's an interesting argument for you to start with, because I guess I'm not sure that that's your strongest of your arguments. Maybe it gives you standing that they got rid of your information, that your information was stolen, but that's your other arguments and not this one. This one, it turns on whether they made this statement, and it seems like I would have hoped most vendors would implicitly be making that statement, and it doesn't make that much difference when they make it explicit or implicit. Well, Your Honor, I think that gets into a little bit of the nitty-gritty of a consumer protection claim, but if a defendant doesn't have a duty to make an affirmative statement and then doesn't make that affirmative statement, then one doesn't have a consumer protection claim. There may be many instances in which a defendant is silent and a consumer would hope. So you don't think you'd have a claim against Zappos, a consumer protection complaint against Zappos, if they hadn't had that statement that we're going to keep your information secure on their website? I don't, Your Honor. I think it would be the same as in the Michaels case Judge Bucklow decided. Their consumers made over-the-counter purchases and provided their credit card, and the goods they received hadn't necessarily been reduced in value just because the over-the-counter point-of-sale system had been hacked. Here, however, we have an online service that explicitly promises two things, choose and that your personal identification information should be protected. It's clearly a material representation. Otherwise, Zappos wouldn't have made it. And so the question then, I guess, becomes can an online retailer promise to provide security, make explicit promises that every consumer sees, and then not fulfill that promise and then have the result be that there isn't an injury? And that can't be the case. Its subset will be no different than Chavez v. Blue Sky, which this Court decided in 2009, where the defendant promised soda that was sourced from a particular place. Well, they still got the soda, but the misrepresentation was that it wasn't sourced at a particular place. And so that was sufficient to give rise to standing. It's also similar to this Court's decision in the Maya case, where consumers alleged that the defendant's actions resulted in them purchasing homes that were worth less than they had represented or that they wouldn't have made the purchase at all, and that that is an injury. Put a different way, a pecuniary injury is an old-school Article III injury because you're out money. And so I guess the answer is yes, had Zappos not made these explicit representations, then there might not be a consumer protection claim. Maybe there would just be a negligent misrepresentation claim, as the district court found. Counsel, there's a recent case from the Eighth Circuit, Henry Supervalue, which is not a good case for you guys. So explain to me why we should, one, go your way in light of that case, and, second, is there a way we can distinguish that case so we're not directly in conflict with it if we're going to go your way? Your Honor, I think the Supervalue case, again, is just one of those over-the-counter situations. You have somebody making purchases. I would suggest a different Eighth Circuit case is – Hold on. Before we run away from Supervalue, I understand the temptation to do so. I have to imagine, though, when you go to a grocery store and you use a credit card to purchase something, there's something in either the bylaws of the company or on the company's website saying we value our customers and we value their privacy. I mean, there's got to be something out there somewhere that you could latch on to. So give me another way to distinguish that case. Well, Your Honor, I think the difference is that those aren't representations made directly to the consumers. Most people who go to the grocery store don't check the website to see whether there's going to be security or not. And, again, it gets to that question of duty. A defendant doesn't have a duty to make an affirmative representation regarding data security. But when they do, and when it's – I'm sorry to cut you off. The Eighth Circuit didn't – as I remember the case, the Eighth Circuit did not rule for the reasons you're saying. They said no standing. And that's an injury question. That's not a cause of action question. I agree, Your Honor. So how do we deal with the Eighth Circuit's standing ruling in that case? Well, Your Honor, I think that the way you square that is by looking at another Eighth Circuit decision, which was recently issued in the Scott trade case. Your Honors may recall that the defendant cited Kuhn v. Scott trade for the proposition that if – for exactly that proposition, that if actual data isn't stolen, then the fact that you make a representation doesn't affect the goods. Well, the Eighth Circuit in August reversed that decision. And the Eighth Circuit held that where there is an explicit promise that there are – that there will be data security, that that becomes the basis of a benefit of the bargain. And that case, which came down after our briefing is done, is at – well, sorry, I don't have it quite handy. But we can locate it. But did that case talk about the standing issue? Absolutely, Your Honor. It turned on standing. And that's actually the first case where a circuit court has decided that the benefit of the bargain can be the basis for standing. And Scott trade is on all fours, which is the – was the defendant's argument before the Eighth Circuit had reversed it. There, consumers go to an online site, Scott trade, where they're required to provide their personal information. Just like here, the – just like here, the privacy policy represented that they would protect information. And just like here, the website had additional representations that they would protect the personal identification information. And the Eighth Circuit only addressed the benefit of the bargain issue because they found that that was sufficient to provide standing. Now, in Alcantara, there's a slight difference. There, it was a contract claim, namely the plaintiffs alleged there was a contract with Scott trade in which they would provide both trading services and security, whereas here it's a consumer protection claim. But that's a – that's a difference – that's a distinction without a difference. Ultimately, we plausibly allege that consumers attach value to a promise to protect security and that the defendant promised to protect their security. We plead the studies that indicate that consumers are willing to pay $11 to $16 more for websites, and it certainly stands to reason that if Zappos had fulfilled their promise, they would have incurred higher overhead costs, which naturally have an effect on the overhead price. So it shouldn't be a challenge to demonstrate a price premium. They promised security. They didn't – they didn't provide it. The value of the goods received were less. That's a pecuniary injury. Counsel, isn't that a more difficult argument than the risk of future harm? I mean, how is this case really different from the Seventh Circuit case and the Neiman Marcus? Or for that matter, I guess it has no presidential value. But my own ruling on standing in Michaels, where I said there was standing, and I don't understand why you're making more difficult arguments for yourself. Well, Your Honor, I – Or what seems more difficult. I don't necessarily want to handicap myself. I do think that a ruling by this Court that there is a damages based on the benefit of the bargain would help move the case forward because then there would be injury common to the entire class, and we wouldn't have to get additional issues. But I don't want to handicap myself. I'm not suggesting that the other arguments are any weaker. And, Judge Bucklow, I think you're exactly right, that the Seventh Circuit's decisions and Your Honor's own decisions in Michaels are absolutely opposite in this case. Here, just as in those cases, hackers specifically identified the Zappos. They wouldn't have stolen that information if they hadn't intended on using them. We plausibly allege that the information that was stolen can be used, namely either fishing and farming by using their email addresses. And we also allege that a number of people actually have suffered identity theft. Our new plaintiffs, O'Brien and Wadsworth, allege that shortly after the data breach. Their claims are out now, though, right? They voluntarily dismissed those claims? That's correct, Your Honor. But, again, as Judge Bucklow noted in the Michaels decision, where other class members have suffered actually identity theft, that goes to the question of whether the named plaintiffs are also at imminent risk. At the end of the day, the only argument that the district court and the defendant proffer on this point is that a lot of years have passed. But, of course, the FDC recognized that it can take many years for these kind of identity theft issues to occur. And let's keep in mind there are 24 million people who are affected. Just doing a little bit of simple math, if you had 1,000 hackers working every single day for 365 days a year and they were able to steal 10 identities, it would take six and a half years to work their way through the entire list. So the mere fact that some time has passed and only some class members and not all class members have suffered identity theft, I think is of no moment. Do you even know that? Don't we determine that as of the time the case was filed? I mean, how do you even know at this point who has or who has not suffered injury in the intervening time? Well, given that we haven't had full class discovery, we don't know that answer yet. But we do know that a couple plaintiffs or a couple of our new plaintiffs suffered. And even the district court recognized that their identity theft injuries were fairly traceable to the Zappos data breach. And we also have a dozen or so class member emails. So do you think this case is controlled by our Crotner decision? I do, Your Honor. I think that it's hard to conceive of how a thief who steals a laptop, almost certainly because they wanted the laptop, creates an imminent or substantial risk of injury, more so than this case where data thieves intentionally steal that information. And that, of course, is the reasoning in the Seventh Circuit's decisions and P.F. Chang's and Neiman Marcus' and Judge Buckley's decisions. And if we agree with you about that, that's all we would have to decide in this case, right? Absolutely, Your Honor. If Your Honor agrees with either our benefit of the bargain theory or this theory or our loss of personal identification information theory. I would also like to just make a couple of points, and I should have mentioned this before, I'd like to reserve a couple of minutes for rebuttal. I'd like to just bring up one of our other arguments, which is the mitigation risk. The district court originally decided that those plaintiffs who actually spent money, that's Hasner and Habashi, originally decided in the 2013 hearing that because those plaintiffs spent money to mitigate their risk, because of the risk of future injury caused by defendant's negligence, that that was sufficient and that that created standing. A few years later, the district court reversed course, reasoning that because so much time had passed and those plaintiffs who had attempted to mitigate the risk hadn't had any triggers or other instances of identity theft that somehow was no longer compensable. But it's a bit ironic to say that it's appropriate for people to take efforts to protect their identity, have those efforts be successful, and then say a few years down the road, you can no longer take advantage of the fact that you protected your identity well. That's a bit of an ironic conclusion. And for that reason, I think that the mitigation is also an independent reason why our plaintiffs have standing.  Yes, please. Thank you, Your Honor. May it please the Court. I think Your Honor is absolutely correct that the super value case provides superb guidance here. It is consistent with this Court's prior ruling in Crotner. And it makes the exact same distinction that our district judge did below, which is if you have a plaintiff who alleges actual identity theft, even if, as we argued, oh, there is really no relationship here, here's why, we don't think it matters, there's no, they've alleged identity theft, they've identified an identity theft, they get to proceed. The ones who did not allege actual theft or even any attempted theft, they have not alleged standing. That is the distinction in super value. It is consistent with Crotner. Can you explain why it's consistent with Crotner? Well, Crotner talks about what is a credible threat. And if someone says, I had something that I had an identity theft, I don't know where it came from. But no one had that in Crotner, right? I thought it was just the laptop was stolen. Well, there was a laptop with Social Security numbers on it. The nature of the data was much more significant than was at issue here. This case is so different than lots of things we've seen in the news lately. So your distinction is about the Social Security numbers. So your distinction is Crotner involves Social Security numbers in this case and super value don't. Yes, Your Honor. Yes. And if I could, very briefly, to talk about this express promise claim. My colleague cited the Maya case a few times. And I would remind the Court that what Maya says is it cautions lawyers against engaging in, quote, an ingenious academic exercise in the conceivable, quote, to explain some theory of injury. And that's at 658 F. 3rd at 1068. And here are plaintiffs who claim to avoid an arbitration clause. They told the district court, we read nothing. We saw nothing. So you can't make us arbitrate. And now here, oh, well, we read this express promise that you'll keep our data safe and secure for all times. I mean, that's an estoppel, Your Honor. They're not a valid theory. So going back to your distinction about Social Security numbers, super value was very much based on this report about what causes identity theft. Can we take judicial notice of that report and its accuracy? I'm not quite sure. Can you defend that approach? And is that what you think we need to do here, to say that Social Security numbers are different from passwords and credit card information and other things that they allege were taken? Well, I don't know about the specific report, but certainly you can't steal an identity based on a portion of a credit card number. So how do we know it's only a portion of the credit card number? I think the allegation is they stole credit card numbers. The allegation through every iteration of the complaint, but first of all, this is what happened. The allegation through every iteration of the complaint was that it was just the credit card tail without anything, just the last four digits. And then after extensive litigation, the two new plaintiffs showed up and said, oh, by the way, we think our full number was stolen. I mean, it's really, it's awful. I mean, so we're reviewing the third amended complaint as the operative one now? Is that right? That is the operative complaint, but Your Honor can't ignore the prior allegations all along through the course of the case with no explanation as to where this new allegation came from after three years of discovery. And, you know, quite quickly. Well, usually we don't assume the complaint is based on discovery. I don't know. The posture here is a little odd, right? Well, there is a case, and I wish I could remember the case name, but there's a case in State court that says that when you plead multiple versions of the complaint consistently and then you plead a new complaint, you don't wash out the, you know, quoting from Macbeth, you don't wash out the damn spot of your prior allegations. There is nothing to suggest that full credit card numbers were stolen here. And if I could, I think this, if I can answer the question. So you're asking us to assume an allegation of the complaint is not true? I am asking you to assume that multiple allegations throughout the course of the complaint is the kind of thing the plaintiffs need to stick with, and then when, you know, the case is on the brink of dismissal, they can't just make something up that has no. So do you have a case in our court that says that? Your Honor, I believe there's a case called Car Carriers. It may be the Seventh Circuit. You know, I apologize for not having one in this circuit. But I think if I can get a little bit into Judge Bucklow's questions about the Michaels case, which she had, and this is significant. Many of the identity theft cases you see in the news, Michaels, P.F. Chang, Neiman Marcus, Target, these are cases where fraud actually precedes the notice. In every single one of these cases, the information was stolen and the thieves used it right away, and the credit card networks were receiving reports of fraud. They identified fraud at a common point of purchase. So, hey, it's really odd. We have 100 fraud claims, and what are the odds that 100 people on the same day all shopped at Michaels? They then notify the retailer. The retailer goes into its system. The retailer then takes its action, gives notice. In this case, and there's no dispute about this, Zappos detected the attack while it was underway, shut down its access, reset passwords, got notice out to the public, and stopped the situation before it could actually result in fraud. So this theory that, oh, well, the criminals may wait 20 years to use it, criminals are not known for their lack of impulsive behavior. Data has a half-life. Data has a shelf-life. Credit card numbers change. People move. The fact that we're now almost, you know, we're now 6 years past this event. But do you agree that we evaluate standing as of the time of the complaint? Well, I. As of the time of the first complaint when the case was initiated? Well, I think the Court allowed them to get into discovery. But I think if Your Honor looks at. Counsel, that's a pretty simple question. It's a yes or no. I think Lujan answers the question for the Court. And the answer is? And the answer is, as the case progresses, as the case progresses, plaintiffs face a higher and higher burden on standing. So it is. Right. But we're still. That's at the each procedural stage. You have to meet the summary judgment standard at the summary judgment stage. We're still at the pleading stage in this case. But it is appropriate for the Court to consider how much time has passed. A case says that. Well, again, I rely on Lujan for the proposition that as the case progresses, it is appropriate for the Court to look at events in the case to see whether standing has met. These are plaintiffs. Counsel, counsel, wait. We're still at the motion to dismiss. It can't just be because there's been a long time since the case was filed. Well, that's, unfortunately, that's the way appeals work. So I agree with you that if we went from motion to dismiss at summary judgment, okay, analysis at summary judgment is different than motion to dismiss. I'm with you 100 percent. I think that's a way to distinguish some of these cases also. But we're still at the motion to dismiss stage. So getting back to Judge Friedland's question, you agree we're at the motion to dismiss stage, correct? We are, Your Honor. All right. So ask the question again. So don't we evaluate standing as of the time that the case was initiated? Okay. So let's do that. The allegation is. Is it yes or no? Your Honor, I believe Lujan permits the district court to look at what's happened. Okay. So you're telling her no. If Lujan is your only support for a no, you're on weak footing in my view. Okay. So you would need another case. Okay. But, Your Honor.  Then Your Honor is pushing me towards the yes. No, no, no, no, no. I don't think she's pushing you either way. I mean, if you have authority otherwise, I'd love to know. As far as I can tell, the answer is yes. But if you have authority otherwise, I'd love to hear it. Lujan doesn't say otherwise in my view. Okay. I understand, Your Honor. Then let's look at the allegation at the beginning of the complaint, which is name, shipping address. So we're starting with yes. Okay. So you're saying, are you saying yes? Yes without a concession of my Lujan argument, Your Honor. I understand. So the answer is yes. Now you can explain why. Thank you, Your Honor. You can explain why in this case, even though it may be yes, you still prevail. Thank you, Your Honor. I apologize for making that harder than pulling teeth. Yes. The allegation at this, and remember, you know, what happens in many of these cases, a company announces a breach and everyone scurries off to court before any, really, because there's such a push and pull in jockeying among the various plaintiffs as to who's going to be in charge of the multidistrict litigation committee that these cases get filed before, you know, anyone really has any decent sense of what happened. That's why we amend the complaint. That's why you amend the complaint. It's why the judge allowed discovery. You know, so, you know, if you look at the allegation here, like, what was the data that was at issue? Name, shipping address, portion of credit card number, passwords scrambled, not in a way that could be used. And when you couple that. What is your description of the facts? Where is that in the operative complaint? Well, they rely on the, you know, what Zappos informed the public as to what happened, and discovery never contradicted that, and they never pleaded anything that contradicted that in terms of the limited scope of the data involved. And if you look at these, if you look at these. Can you point to the place in their complaint where they describe the data involved the way you just did? Well, they allege. What are you looking for, counsel? I'm looking for the complaint. I apologize. So I do see that they quote the notice that was sent in a way that is similar to what you just said. Yes, and that was what I was looking for, Your Honor. But then I thought that they then also talk about whole credit card numbers in the same complaint that is the operative one. Right, and again, and that's a change from the prior versions of the complaint. And it's in the allegations of the two new plaintiffs, Ms. O'Brien and Ms. Wadsworth. You know, so if their case stands or falls on whether full credit card information was stolen, this case is not going to have a short life expectancy in the district court. You know, and you had an event that potentially affected 24 million people. And after three years of discovery, huge publicity of this case, they found two people who claimed, well, I had something fluky happen after this event. Two out of 24 million. And the judge allowed those two to proceed. Well, surely Zappos knows whether it was the full credit card number or it was only the last four digits. And presumably you people all know that by now. Right, yeah, it was just the tale, Your Honor. Well, they allege otherwise in their third amended complaint, correct? They have changed their story in the third amended complaint, correct, Your Honor. So does standing at any rate determine, is it determined on whether there were four numbers or the entire number? Would it make a difference for standing as opposed to summary judgment or even a 12B6 claim? I submit not, Your Honor. And I call to the Court's attention the Second Circuit's ruling in the Whelan case, which found that, and that was out of the Michaels incident, Your Honor. Your Honor found in favor of the defendant on the merits. A parallel case went all the way through to the Second Circuit, and the Second Circuit ruled on standing, finding that even though full numbers were stolen, and even though there was actual fraud on those numbers, because the plaintiff's fraud losses had been fully reimbursed, there was no standing. Well, isn't that just a difference, then, in theory between the Second Circuit and the Seventh Circuit, and actually in the Ninth Circuit in his prior ruling? It may be, Your Honor, and I'm not suggesting that this Court needs to go all the way to the Second Circuit approach. You know, we have argued that Clapper is a significant change in the law. And you think Crotner is clearly irreconcilable with Clapper? I think, Your Honor, I think if we were talking to an en banc court, I would say that Clapper overrules Crotner. I don't think we need to get there, because I think this Court properly, the district court properly applied Crotner. The district court looked at Crotner, looked at the nature of the data involved, found there is no credible threat as to these plaintiffs, looked at the history of litigation properly, looked at the fact there was no loss, looked at the rapidity of Zappos' response to the incident, and correctly recognized that this case needed to end. And unless the Court has any further questions, I'll take my seat. Thank you very much, Counsel. No questions. Thank you, Your Honor. Thank you. May it please the Court again. I just want to briefly address one thing that my learned colleague argued, which is that the plaintiffs allege that they didn't read anything. That's just a mischaracterization. They did say that they didn't read the privacy policy, which is attached by a small link at the bottom of the page, and that did include some promises about data security. But we also allege that on the actual payment page that every single customer has to go to, that that payment page has the safe guarantee. So I just wanted to address that at one point. Do you allege that whole credit card numbers were revealed? Well, Your Honor, we alleged in the last complaint, based upon the fact that Plaintiff Wadsworth had suffered identity theft on the entire debit card that she used. She used the debit card with Zappos, and then that debit card was drained within a month or two after the ‑‑ within a month or two. And so that combined with the fact that ‑‑ The super value doesn't call that identity theft. They call it debit card fraud. That's correct, Your Honor. But you want to say there's no such distinction? There's no ‑‑ I want to ‑‑ I think it's a distinction without a difference in this circumstance. Whether somebody has their identity stolen or their fraudulent credit card charges, I think nobody would dispute that those are all injuries that would give rise to Article III standing. But I also don't think that our case turns on whether it was just the tail or the entire credit card. In particular, we've alleged plausibly and certainly under the standard of ‑‑ that we should be applying on standard, which is that you accept the material allegations as true and draw all reasonable inferences in the plaintiff's favor. Well, if it's only the last four, how do you get to any kind of risk to these people? Well, Your Honor, that risk comes from the fact that their names, e‑mails and passwords were stolen. And that's the reason why ‑‑ But is there anywhere that it's not a scrambled password? The quote from the notice is a scrambled password, right? That ‑‑ well, they call it a cryptographically scrambled password. But we allege that they didn't actually use proper encryption, and that's a plausible allegation because there were so many people who actually suffered identity theft because of their passwords. And that was shortly after the event had occurred. And that's why I found some of the comments my learned colleague had made interesting because the notion that only cases where there's a raft of identity theft right out of the gate can be viable is surprising, because we did allege that there were a number of people who suffered identity theft right away. And I explained earlier why it's reasonable that some issues can take a while. I see that I'm out of time. Unless you all have any more questions, I appreciate the court's attention. Thank you, counsel, very much. Thank you both for your argument. This matter is submitted. And this panel is adjourned.
judges: Owens, Friedland, Bucklo